[Civ. No. 51921. Second Dist., Div. Five. Dec. 19, 1978.]

KLAMATH-ORLEANS LUMBER, INC., Plaintiff and Respondent, v. CLARENCE F. MILLER et al., Defendants and Appellants.

COUNSEL

Frederick T. Mason for Defendants and Appellants.

John Kappos for Plaintiff and Respondent.

OPINION

KAUS, P. J.—Plaintiff Klamath-Orleans Lumber, Inc., doing business as Baybarz Binder Company, brought this action against defendants Clarence and Hilda Miller for an injunction and damages for unfair business competition. The Millers are former employees of plaintiff who went into business for themselves and solicited many of plaintiff's customers. The equitable issues relating to the injunction were tried by the court without a jury. The court granted first a preliminary and then a permanent injunction restraining defendants from soliciting certain of plaintiff's customers. On the issue of damages, trial was by jury and the jury found in favor of plaintiff in the amount of $20,894. Defendants appeal from the judgment.

FACTS

Plaintiff manufactures load binders[1] which it sells wholesale to customers in 47 different lines of industry throughout the United States. Prior to the Millers' entry into the field plaintiff enjoyed a preeminent position in the binder market, since it manufactured more quality binders than all of its competitors put together.

From April 1968 until November 1972, defendant Clarence Miller was plaintiff's shop manager, with duties ranging from coordinating production to overseeing a crew of 20 to 30 men. His wife, Hilda, was plaintiff's office manager from January 1970 until November 1972.

Before and during this time plaintiff's president and major stockholder, J. W. Griffin, expended substantial time, energy and money in traveling around the county developing a list of the leading credit-worthy binder purchasers. The list contained, among other things, information concerning special financial considerations enjoyed by certain of plaintiff's clients. During the time of defendants' employment the customers'

---

[1]Load binders are devices used to secure loads, such as on truck trailers.

names were considered by all parties to be confidential information, although, of course, defendants were aware of the existence and commercial value of the list.

In July 1972, while still employed by plaintiff, Clarence Miller secretly began the construction of a drill press similar to that used in the manufacture of plaintiff's products; in October 1972 he leased, in his son's name, a manufacturing building in the Los Angeles area. The Millers quit their employment with plaintiff November 17, 1972, and immediately began organizing to go into competition with plaintiff. They consulted an attorney about competing with a former employer and the use of the former employer's customer list, ordered 62 telephone directories for areas in which plaintiff's customers were located, and Hilda Miller began to write down from memory plaintiff's customers and the areas in which they were located.

Soon thereafter the Millers began actual production of binders markedly similar to plaintiff's. In addition, they prepared both a brochure depicting their product line and an "interchange sheet" which compared model numbers of defendants' and plaintiff's products. Finally, they composed a potential customer list based upon Hilda Miller's recollection of names on plaintiff's list and upon names selected by them from telephone directory yellow pages.

Defendants chose to solicit only 176 of the several thousand potential customers nationwide. Of those 176, 88—or 50 percent—were on plaintiff's list. In many large cities, out of dozens of candidates, the sole firm solicited was a customer of plaintiff. (See fn. 2, *infra.*) In others nearly all of defendants' solicitees were customers of plaintiff. Of these 88 customers, at least 41 had been purchasing from plaintiff for three years or longer, and at least 50 of them had made purchases of $5,000 or more.

Defendants sold to 23 of the 88 customers of plaintiff that they solicited. Indeed, in the early months of their operation, 45 percent of defendants' customers were former customers of plaintiff. Within five months they were not only making sales of $7,000 per month but were clearing a $2,000 per month net profit. At the time they began their business they were offered $50,000 for it, although the total cost of their machinery, equipment and inventory was less than $35,000; by September 1973, they estimated their business to be worth $100,000.

A competing binder manufacturer testified—for the defense—that his firm solicited in true directory-scanning style and initially received a favorable response of only about 5 percent; by contrast, defendants' early solicitations yielded a favorable response of over 26 percent.

The trial court's conclusions of law were:

"1. That the list of the names of persons and entities with whom Plaintiff did its most profitable business and made its most regular sales was a confidential customer list and not accessible to competitors.

"2. That from Defendants [*sic*] conduct in manufacturing products in substantially the same configuration as Plaintiff's products, drawing a specific comparison between Defendant's [*sic*] and Plaintiff's products both as to model numbers and prices in Defendant's [*sic*] advertising, and in mailing such literature to Plaintiff's known customers, it may be reasonably inferred and the court has drawn and does draw the inference and reaches the inescapable conclusion that Defendant's [*sic*] solicited Plaintiff's customers and used others of Plaintiff's trade secrets with intent to injure the Plaintiff.

"3. The court concludes that Defendant's [*sic*] intent to injury Plaintiff may also be inferred from Defendant's [*sic*] conduct other than and in addition to the solicitation of Plaintiff's customers, to wit, Defendant's [*sic*] secret construction of a press designed similar to Plaintiff's and so designed by Defendant Miller while in Plaintiff's employ, Defendant's [*sic*] secret renting of a manufacturing facility while in Plaintiff's employ, Defendant's [*sic*] preparation of its [*sic*] manufacturing facility so as to permit full production within only three months after terminating Defendant's [*sic*] employment with Plaintiff, and Defendant's [*sic*] act of seeking legal counsel to guide them in their intention to use the information gained during their employment to Plaintiff's detriment.

"4. That taken as a totality, the evidence is clear that Plaintiff is entitled to a money judgment in the amount of $20,894.00 as found by the jury and a judgment making permanent the Preliminary Injunction Order to November 16, 1976."

## DISCUSSION

Defendants strenuously argue that plaintiff failed, as a matter of law or fact, to prove the five elements supposedly necessary for recovery,

to wit: (1) The information used was confidential and not readily accessible to competitors; (2) Defendants solicited the customers of plaintiff with intent to injure it; (3) Defendants sought out certain preferred customers whose trade is particularly profitable and whose identities are not generally known to the trade; (4) The business was such that a customer would ordinarily patronize only one concern; and (5) The established business relationship between the customer and the plaintiff would normally continue unless interfered with. (See *Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198 [246 P.2d 1].) ■ Defendants fail, however, to acknowledge the ultimate thrust of the law; for this multipart test notwithstanding, it is well settled that although a former employee who joins or establishes a competing enterprise may properly solicit business from those he served in this previous employment, "an employee . . . should not be allowed to exploit information which his employer compiled at great expense and which represents a valuable business asset." (2 Callmann, Unfair Competition Trademarks and Monopolies (3d ed.) § 52.2(c)(2); 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 86.) ■ Thus, if defendants were privy to facts, whatever they were, through a special confidence that they accepted, "the first thing to be made sure of is that [they] shall not fraudulently abuse the trust reposed in [them]. It is the usual incident of confidential relations. If there is any disadvantage in [that] fact . . . [defendants] must take the burden with the good." (*E.I. Du Pont de Nemours Powder Company* v. *Masland,* (1917) 244 U.S. 100, 102 [61 L.Ed. 1016, 1019, 37 S.Ct. 575].) Hence, we must sustain the judgment if the record contains substantial evidence of defendants' misappropriation and wrongful use of "confidential" information. It does.

Manifestly, defendants were able to—and did—solicit more selectively by virtue of their experience with plaintiff than if they had been starting business from scratch.[2] Defendants contend, however, that since the identities of the customers solicited were common knowledge in the trade, no unfair competition occurred. The facts are otherwise, for the evidence reveals that only through substantial personal effort could the nation's "desirable" binder purchasers be determined. Although the

---

[2]The proof is in the eating: For example, in North Dakota, Ohio and Oklahoma defendants solicited only plaintiff's customers. Similarly, in the cities of El Paso, Fort Worth, Lubbock and Texarcana, Texas, defendants used only names on plaintiff's list. Fourteen of sixteen solicitations made in four California cities—Fresno, Oakland, Porterville and San Leandro—were to customers of plaintiff, as were seven of ten solicitations in four cities in Washington, and six of nine in two cities in Oregon. Six of seven firms solicited in Salt Lake City were customers of plaintiff, as were four of the seven Phoenix firms contacted.

identity of some of plaintiff's customers may have been easily ascertainable by competitors, it cannot be said that the entire—or even a majority—of the customers scattered throughout the nation were readily accessible to defendants here. (See *Reid* v. *Mass Co., Inc.* (1957) 155 Cal.App.2d 293 [318 P.2d 54].)

Thus, by any definition it is clear that plaintiff had on file a "preferred" or "select" customers list of substantial economic value to its business. ■ "There can be no doubt that [a] list of preferred customers, ascertained originally by continuous solicitation and investigation, and the specially arranged list of charges and bonuses, developed by long experience, [constitutes] a trade secret of value." (*Scavengers P. Assn.* v. *Serv-U-Garbage Co.* (1933) 218 Cal. 568, 573 [24 P.2d 489].)

Moreover, where, in order to do business the employer is forced to impart such select information to certain key employees, the information hardly becomes part of the employees' knowledge which they may freely use at some later time. Rather, it remains the exclusive[3] property of the employer which must be appropriately protected. (See *Olschewski* v. *Hudson* (1927) 87 Cal.App. 282 [262 P. 43].) ■ The case of *Empire Steam Laundry* v. *Lozier* (1913) 165 Cal. 95 [130 P. 1180], is persuasive: " 'The names of the customers of a business concern whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the goodwill of a business which enterprise and foresight have built up, should be deemed just as sacred and entitled to the same protection as a secret of compounding some article of manufacture and commerce. . . .' " (*Id.,* at p. 102.)

■ Equally in point is *Alex Foods, Inc.* v. *Metcalfe* (1955) 137 Cal.App.2d 415 [290 P.2d 646]: "Equitable protection may be invoked against the subsequent use by a former employee of knowledge of the 'peculiar likes and fancies and other characteristics' of the former employer's customers where such knowledge will aid him in securing and retaining their business. This rule applies generally to trade route cases as well as others involving a knowledge of the customers desired . . . their preferences for certain products, and their buying habits." (*Id.,* at p. 427, citing *Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198, 205 [246 P.2d 11].)

---

[3]True, defendants could have elected to expend their own resources in uncovering the information in question, in which case they could thereafter have used it with impunity. Instead, however, they chose simply to ride plaintiff's coattails.

■ In sum, there is substantial evidence to support the trial court's determination that plaintiff's knowledge was confidential and deserving of protection, and that defendants' ability to solicit both more selectively and more effectively was due to their extensive use of plaintiff's customer list—a patent act of unfair competition.

After Judge Turpit had decided to issue a permanent injunction, the issue of damages was tried to a jury before Judge Donnellan. (See *Pacific Western Oil Co.* v. *Bern Oil Co.* (1939) 13 Cal.2d 60, 66-69 [87 P.2d 1045].) In these proceedings plaintiff sought damages at law for the pecuniary loss which it had suffered because of defendants' wrongful solicitations. Thus the issue was "the actual damage suffered by virtue of profits on sales actually diverted" from plaintiff's business. (*Hesse* v. *Grossman* (1949) 152 Cal.App.2d 536, 542 [313 P.2d 625].) As the matter was tried, the "sales actually diverted" consisted of sales of specific items—"Exhibit 21" items in the jargon of the trial—to 23 specific former customers of plaintiff between January 1, 1973, and June 1976, the time of trial. These sales totaled nearly $170,000 and comprised about 42 percent of defendants' total business.

■ Although, as noted, plaintiff was claiming damages at law—not an accounting in equity—it chose to establish the extent of its loss, by showing defendants' profit from the diverted sales. The fact that it opted for this entirely legitimate method of proving its damages (*Western Electro-Plating Co.* v. *Henness* (1961) 196 Cal.App.2d 564, 573 [16 Cal.Rptr. 691]) did not change the nature of the jury trial phase of the case: it remained an action for damages and did not become one for an accounting.[4]

During that period defendant Clarence Miller was manufacturing and selling load binders through a partnership consisting of himself and his sons Errol and Darrel. Defendant Hilda Miller was not one of the partners, but according to the evidence worked full-time as a bookkeeper and office manager much in the way she had worked for plaintiff. She never drew a salary because, as she claimed, the business could not afford to pay her one. She did, however, expect to get paid. Both Clarence and Errol drew salaries of about $12,000 a year each.[5]

---

[4]We emphasize that we discuss the error complained of within the framework of the case that was tried, namely an attempt to recover the damages caused to plaintiff's business by certain of defendants' sales. Plaintiff did not try an equitable action for an accounting which would have sought to disgorge defendants' actual profits from those sales. (See, however, fn. 7, *infra.*)

[5]Darrel, though an investor in the partnership, did not contribute labor.

Ernest Demos, a C.P.A., who had inspected defendants' books, testified to two profit figures: first, if one ignored the fact that the partnership had received free bookkeeping and office management services, the figure was $20,894—the precise amount of the jury verdict. On the other hand if the figures are adjusted to reflect an allocation of the reasonable cost of a full-time bookkeeper and office manager—assumed to be $7,000 per year—the net profit would have been only $8,050.

There are some indications in the record that the partnership may not have required the services of a full-time bookkeeper and office manager, plus hints that Hilda Miller may have been compensated, in part, through the salary paid to her husband Clarence. None of this, however, would have justified the jury in ignoring the cost of bookkeeping and office management altogether. Plaintiff claims that Hilda Miller did not have to be believed when she testified that she expected to be paid and that since defendants managed to produce and sell the items in question without paying her a salary, the fact that plaintiff would have had to hire a bookkeeper, had it made the sales, is immaterial. Plaintiff is mistaken. As we have repeatedly pointed out, the issue was plaintiff's damages. Defendants' net profits were merely advanced as a convenient measure of plaintiff's loss. The profits of a business which gets its bookkeeping services for nothing are a poor yardstick for one which is not so fortunate.[6]

The judgment must therefore be reversed, but only on the issue of damages. (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801-803 [197 P.2d 713].) Even such a retrial can be avoided if plaintiff were to declare itself satisfied with the lower of the two figures already in evidence. Our disposition is therefore as follows:

The judgment against defendants is affirmed in all respects except on the issue of damages, which issue shall be retried unless, within 10 days of our remittitur, the plaintiff shall file a document by which he agrees that the judgment may be reduced from $20,894 to $8,050.[7]

[6]Throughout the trial, the court agreed with defendants' analysis with which we, too, agree. At their motion for a new trial, defendants pointed out that the verdict was irreconcilable with their—and the court's—position. The motion was nevertheless denied. We might see things differently if we had the benefit of the court's reasoning, which we don't.

[7]Nothing in this opinion shall be construed as urging plaintiff to accept this reduction. We hinted in footnote 4, *ante*, that the result we reach is demanded by the approach taken by plaintiff which sought to prove its own damages resulting from the sales in question, in lieu of demanding an accounting of defendants' profits from those sales.

Each party shall bear its own costs on appeal.

Stephens, J., and Ashby, J., concurred.

---

Were plaintiff to seek the latter, equitable remedy, the rule may be that not only would defendants have been unable to credit themselves for the salary Mrs. Miller did not receive, but that they even might have had to deduct any salary paid out to Mr. Miller. (Rest., Torts, § 748, com. e: *"Salaries or Wages of persons responsible for.infringing conduct.* No deduction is to be made for the value of the defendant's own labor. Where the defendant is a corporation no deduction is to be made for the salaries or wages paid to a stockholder who owns substantially all of its stock and directs its tortious conduct." 87 C.J.S. Trade-Marks, Etc., § 216 (2), pp. 615-616: ". . . [I]t has been held that the value of the time, talent, and services expended by an individual defendant in wronging plaintiff should not be deducted, . . ."