724 P.2d 596

**AMEX DISTRIBUTING CO., INC., an Arizona corporation, Plaintiff-Appellant, Cross-Appellee,**

**v.**

**Frank MASCARI and Jane Doe Mascari, Defendants-Appellees, Cross-Appellants.**

**No. 1 CA–CIV 8401.**

Court of Appeals of Arizona, Division 1, Department D.

July 3, 1986.

Burch & Cracchiolo, P.A. by Daryl Manhart, David G. Derickson, Phoenix, for respondent-appellant, cross-appellee.

Jennings, Strouss & Salmon by Stephen A. Myers, David J. Estes, Kevin Worthen, Phoenix, for defendants-appellees, cross-appellants.

## OPINION

RICHARD M. DAVIS, Judge Pro Tem.

The plaintiff-appellant in this litigation seeks to enforce a former employee's covenant not to use employment-derived customer information, a covenant not to compete, and a provision specifying liquidated damages for breach. One of our tasks is to apply principles expressed by our supreme court in *Olliver/Pilcher Insurance, Inc. v. Daniels*, 148 Ariz. 530, 715 P.2d 1218 (1986).

## I. FACTS

The plaintiff-appellant corporation, Amex Distributing Co. Inc. (Amex), is in the produce brokerage business. At the time of hearing in July 1984, its principal shareholder, Charles Ciruli, had been a produce broker for twenty years.

In late 1975 or early 1976, the defendant-appellee, Frank Mascari, had finished high school and was working in the produce department of a Los Angeles supermarket. Ciruli had known Mascari's father for 15 to 18 years. He offered Mascari a job with Amex. Mascari, then 19, started as a "bird-dog," or produce inspector, working under produce broker Joe James in appellant's offices in Nogales, Fresno and Chula Vista.

In 1977, Joe James quit Amex and took with him two important Michigan accounts. In the confusion which followed Mascari necessarily assumed larger responsibilities. In the next year or so one of Amex's important East Coast customers decided to go into the lettuce business. Although Amex had never previously brokered lettuce on a large scale, Ciruli decided to set up such operations in Yuma and Salinas. He groomed Mascari to manage these. Ciruli hired an experienced broker, Austin Rinella, to introduce Mascari to lettuce shippers and to some customers.

As described by the evidence, the produce brokerage business is a highly competitive economic arena in which each new day brings fresh opportunity and challenge for a broker to put together transactions for shippers and buyers. There are no exclusive dealing arrangements, and on any given day a buyer may be working through more than one broker for a supply of a single commodity. There is an industry "Blue Book," listing both brokers and buyers. Ciruli's testimony is generally to the effect that Amex owed its success in the business to an in-depth knowledge of its customers' needs and predilictions and an assiduous pursuit of serving those needs by frequent contacts. There was also evidence that any interested and energetic broker could visit a buyer and thereby learn its individualized needs and buying habits.

In early 1979, Ciruli presented to Mascari an "Employment Agreement" for signature. While the agreement contained a number of provisions subject to specification on a to-be-determined basis, it referred to the possibility of Mascari being the general manager of a possible new "specifically designated" operation and further provided that in respect to such operation Mascari would be compensated at the rate of 20% of the profits for the first year, 35% for the second year, and 50% for the third year. After the third year, the agreement gave Mascari the option to have the opera-

tion be a partnership with Amex with a 50/50 division of the profits and obligations.

Though advised by Ciruli to see a lawyer about the agreement, Mascari did not. There was a close relationship between the two, which was described by both in familial or near-familial terms. Mascari was 22 years old when he signed the agreement in February 1979.

The critical substantive provisions in this litigation are paragraphs 6 and 10 of the employment agreement. Paragraph 6 reads as follows:

*Confidential Information:*

Employee acknowledges that by reason of this position and employment with Employer that Employee will be entrusted with information relating to the customers of the Employer, as well as to Employer's means and methods of handling and servicing the business and affairs of said customers. Employee agrees with Employer that at all times during this employment with Employer, and at all times after termination of employment with Employer, if such termination occurs, that Employee shall, consistent with duties to Employer's customers, and duties to the Employer, keep and maintain this information confidential and shall not utilize any of said information to compete against the Employer, either directly or indirectly.

The heading and introductory clause of paragraph 10 and subparagraph 10a are as follows:

*Agreement not to Compete or to do Business for or With Employer's Customers; Injunction; Damages:*

In the event that the employment of the Employee by the Employer is terminated at some future time, then, and in such event, regardless of whether the Employee or the Employer initiated or caused such termination, and regardless of the reasons, grounds, or cause for such termination, Employee then expressly contracts and agrees with the Employer that:

a. Employee will not, for a period of 36 months after said date of termination, compete with Employer in any way, either directly or indirectly, or with or through any other person, corporation, firm or other legal entity, nor do business with or for any customer of the Employer, which the Employer had as a customer as of the date of termination, or, had as a customer during the 36 months prior to the said date of termination.

In other portions of paragraph 10, subparagraph 10b provides Amex with the remedy of injunction and/or liquidated damages at the rate of 75% of Mascari's billings of Amex customers during the first year, 60% the second year, and 50% the third year. It further provides for the payment of attorney's fees to Amex in the event of breach. Subparagraph 10(2)d is an acknowledgment by Mascari of the reasonableness of all of the terms of the contract and is set forth in the margin.[1]

Mascari ran the new Amex lettuce operation, and it prospered. In 1984 Ciruli learned that Mascari had helped set up a relationship between a shipper and a competitor. He terminated Mascari.[2] Mascari

---

1. "Employee hereby acknowledges and agrees with the Employer that the provisions of this paragraph 10 are fair and reasonable; that the same are reasonably necessary to provide Employee with greater responsibility, greater trust and an opportunity for increasing Employee's knowledge and experience, as part of the employment relationship between Employee and Employer; that the same are reasonably necessary in order to protect the goodwill and business interest of the Employer relating to the business customers of the Employer, which business interests and goodwill has been developed over many years at a substantial cost and

expense to the Employer; and that the terms and conditions hereof are not unreasonable as to time, limitation, or purpose."

2. Mascari did not contest his termination beyond testifying that he received no remuneration for helping set up the shipper/competitor relationship. Mascari testified that he earlier sought to exercise the option given him in the employment agreement to have the Yuma/Salinas lettuce operation be a partnership in which he would have an equal voice, because he felt that savings could be effectuated, but that this had been rejected by Ciruli.

set up a brokerage business in Winterhaven, California, and sooner or later called or in any event transacted business with a number of the customers he had been dealing with for Amex. At the time of hearing all of his customer-clients had been Amex customers. One of his major customer-buyers was his father.

There is no evidence in this case that Mascari took or copied any Amex customer list. While there is a full Amex customer list in evidence (Exhibit 4), it was prepared for purposes of litigation. Amex also submitted a list of certain key customers in Exhibit 16 in connection with a request that Mascari be specifically barred from doing business with those, if not others.

Amex sought injunctive relief and damages under paragraphs 6 and 10 of the employment agreement. The trial court first denied injunctive relief and later granted Mascari's motion for summary judgment on the entire complaint. In its final dispositive minute entry, the trial court stated, in part:

> The Court concludes as a matter of law based on the undisputed facts that Defendant acquired no trade secret or confidential information during his employment by Plaintiff. Further, that the noncompete provisions of the contract (paragraph 10a) are unreasonable in scope (no direct or indirect competition, no doing business with or for any customer of Plaintiff); they are unreasonable in duration (three years) and they are unreasonable in territory (none is specified, it is argued that the territory is the entire United States). The contract between the parties, insofar as it pertains to Counts I and II of the Complaint is therefore contrary to public policy and unenforceable.

Appellant contends on appeal that the trial court erred both in respect to its ruling on the prohibition in paragraph 6 against using customer information, and the noncompetition provisions of paragraph 10. In doing so, appellant focuses on a narrowed claimed right to relief in respect to the 57 customers which are the subject of exhibit 16, and also stresses in view of the passage of time its claim for damages pursuant to subparagraph 10b. In its pleadings and in Ciruli's testimony at the hearing, however, Amex sought relief according to the full terms of paragraphs 6 and 10.

## II. LEGAL BACKGROUND

From the *Dyers' Case*[3] in 1414 to *Mitchel v. Reynolds*[4] in 1711, judicial policy ran strongly against a bond or covenant not to compete. *Mitchel v. Reynolds*, a business transfer case, ushered in the common law "rule of reason" now generally applied in America with or without attendant judicially-tailored modification as practiced in some jurisdictions, or "blue-penciling"—eliminating grammatically severable unreasonable provisions—as practiced in others, including Arizona. The courts in these cases seek to accommodate (1) the right to work, (2) the right to contract, and (3) the public's right to competition. Valiulis, *Covenants Not to Compete: Forms, Tactics and the Law,* (John Wiley & Sons, 1985), p. ix; and *see generally* Blake, *Employment Agreements Not to Compete,* 73 Harvard L.Rev. 625 (1960).

Restrictive covenants which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored. *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.,* 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4, 6 (1977). Such contractural provisions are strictly construed against the employer. *Grant v. Carotek,* 737 F.2d 410, 411–412 (4th Cir.1984, applying Virginia law). This is to be contrasted with a covenant given in connection with the sale of a business. There the courts are more lenient because of the need to see that goodwill, which is usually sold, is effectively transferred. *See Gann v. Morris,* 122 Ariz. 517, 596 P.2d 43 (App.1979); *Esmark, Inc. v.*

**3.** Y.B.Mich. 2 Hen. 5, f. 5, pl. 26 (C.P. 1414).

**4.** 1 P.Wms. 181, 24 Eng.Rep. 347 (Q.B. 1711).

*McKee,* 118 Ariz. 511, 578 P.2d 190 (App. 1978).

Reasonable restraints—those no broader than the employer's legitimately protectable interests—will be enforced in Arizona. *American Credit Bureau, Inc. v. Carter,* 11 Ariz.App. 145, 147, 462 P.2d 838 (App. 1969), and cases cited; *cf. Lessner Dental Laboratories, Inc. v. Kidney,* 16 Ariz.App. 159, 492 P.2d 39 (App.1971). *Olliver/Pilcher Insurance, Inc. v. Daniels, supra,* involving an "anti-pirating provision" for damages without a covenant prohibiting competition, makes it clear that Arizona will follow the blue-pencil rule adopted by the *Restatement of Contracts. See Donahue v. Permacel Tape Corp.,* 234 Ind. 398, 127 N.E.2d 235, 41 (1955), *Eastern Business Forms, Inc. v. Kistler,* 258 S.C. 429, 189 S.E.2d 22, 24 (1972), and *Annot.* 61 A.L.R.3d 397, 410 (1975), cited in *Olliver/Pilcher, supra.*

## III. ANTITRUST LAW

Appellee advances two preliminary positions which warrant comment. First, appellee suggests that the subject covenants violate Section 1 of the Sherman Act, 15 U.S.C. § 1, and its Arizona analog, A.R.S. § 44–1202. Appellee argues that the covenants either are *per se* violative of the Sherman Act or that they violate the "rule of reason" applied in Section 1 cases since *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). These particular assertions are clearly wide of the mark under the evidence adduced in this case and it further appears that appellee confuses two similar—but not identical—rules of reason.

■ Employee covenants not to compete are not *per se* violative of Section 1 of the Sherman Act. *Consultants & Designers, Inc., v. Butler Service Group, Inc.,* 720 F.2d 1553, 1560–1562 (11th Cir.1983); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 264–269 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *United States v. Empire Gas Corp.,* 537 F.2d 296, 307–308 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158,

51 L.Ed.2d 572 (1977); *see also United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir.1898), *modified and affirmed,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), cited in *Three Phoenix Co. v. Pace Industries, Inc.,* 135 Ariz. 113, 659 P.2d 1258 (1983); and *compare Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1082 (2nd Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978).

■ Antitrust rule of reason analysis requires the showing of adverse market impact—injury to competition. *Consultants & Designers, supra* at 720 F.2d 1562; *Lektro-Vend, supra* at 660 F.2d 269. No evidence was adduced in this case remotely tending to show that the covenants adversely impacted upon any market.

The common law rule of reason, which has its source in *Mitchel v. Reynolds, supra,* and the antitrust laws' rule of reason focus on protecting different interests, and they are not precisely identical. *See* Bork, *Ancillary Restraints and the Sherman Act,* 15 A.B.A. Section of Antitrust Law Proceedings 211, 215–216 (1959).

## IV. ANCILLARITY

■ Appellee also preliminarily argues that the subject covenants were so manifestly the dominant purpose of the employment agreement that they cannot be considered ancillary. An ancillary agreement is one subordinate to the main lawful purpose of the transaction. *Three Phoenix Co. v. Pace Industries, Inc., supra* at 135 Ariz. 117, 659 P.2d 1262.

■ It is true that the courts will not enforce a covenant not to compete given without consideration or which is not incidental to another lawful agreement. *See American Credit Bureau, Inc. v. Carter, supra* at 11 Ariz.App. 147, 462 P.2d 840. It is also true that Ciruli testified that the covenant not to compete was dominant in his mind because of Joe James' departure.

■ The employment agreement, however, clearly contemplated a substantial promotion for Mascari. Specific rates of

increased compensation were defined. The covenants were accordingly supported by consideration and they were ancillary. *Annot.*, 51 A.L.R.3d 825, 841–842 (1973).

## V. UTILIZATION OF CUSTOMER INFORMATION

Appellant argues first that appellee is in violation of paragraph 6 of the agreement. The charge is not disclosure of confidential information to others, but solely the use by appellee of confidential information to compete, assertedly unfairly, against appellant. Arizona law on this subject is sparse.

Many courts, including the United States Supreme Court,[5] have used the working definition of a trade secret set forth in § 757 of the *Restatement of Torts* (1929), *Comment* b:

A trade secret may consist of any formula, pattern, device, or compliation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

The *Restatement* Comment goes on to say:

It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list or customers.

■ Two basic types of information are involved in the present case. The first encompasses basic general principles for the aggressive pursuit of success in a highly competitive field of business (Exhibit 7). The essentials of these (know the customer, be constantly aware of his concerns, keep in regular frequent contact, limit conversations to relevant business, etc.), are clearly in the public domain. They are the subject of books at a public library. When we say that, we do not in any sense minimize their value. On the contrary, we take it as established that assiduous application of these general principles is largely responsible for appellant's success over the years and high rating in the trade. We merely

hold that Amex's general (and generally recognized as sound) methods and principles of doing business could not be the subject of misappropriation by Mascari, as long as he did not misrepresent his identity, which was not alleged or shown. See the well-known opinion in *Arthur Murray Dance Studios of Cleveland v. Witter,* 105 N.E.2d 685, 709 (Ohio Common Pleas 1952).

■ The more important body of information concerns knowledge of particular customers accrued by Mascari as an employee of Amex. If customer information is truly confidential, and to a substantial degree inaccessible, it may be given a measure of the protection accorded true trade secrets, *1 Milgrim on Trade Secrets,* (Matthew Bender 1985), § 3.05[1]. The relevant basic policy considerations are well stated in *ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 93–94, 273 N.E.2d 393, 396 (1971):

Conflicting social and economic policy considerations are present in each trade secret case. A business which may invest substantial time, money and manpower to develop secret advantages over its competitors, must be afforded protection against the wrongful appropriation of confidential information by a prior employee, who was in a position of confidence and trust. At the same time, the right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth.

*See also Reed, Roberts Associates Inc. v. Strauman,* 40 N.Y.2d 303, 386 N.Y.S.2d

**5.** *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000–01, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815,

831 (1984).

677, 353 N.E.2d 590 (1976); Jager, *Trade Secrets Law* (Clark Boardman 1985) §§ 3.01[2] and 13.01[2]; and Epstein, *Modern Intellectual Property* (Harcourt Brace Jovanovich 1985) pp. 13–14.2.

As another court has rather memorably put it, absent a special and enforceable duty, an alert salesperson is not required to undergo a prefrontal lobotomy. *Fleming Sales Co., Inc. v. Bailey,* 611 F.Supp. 507, 514 (N.D.Ill.1985, applying Indiana's version of the Uniform Trade Secrets Act in the absence of covenant).

In appropriate circumstances, a particular use of specific customer information may constitute a violation of a former employer's protectable interest. *See, e.g., Klamath-Orleans Lumber, Inc. v. Miller,* 87 Cal.App.3d 458, 151 Cal.Rptr. 118 (1978). We doubt such a violation exists here. Our doubt is based upon the principle expressed in a line of Illinois cases holding that customer information is not proprietary and its use not unlawful when the customers characteristically did business with more than one source so that the customer was known to the competition. *Jefco Labs, Inc. v. Carroo,* 136 Ill.App.3d 793, 91 Ill.Dec. 513, 516, 483 N.E.2d 999, 1002 (1985); *Lincoln Towers Ins. Agency v. Farrell,* 99 Ill.App.3d 353, 54 Ill.Dec. 817, 821, 425 N.E.2d 1034, 1038 (1981), noted in *Jager, supra,* at § 13–05; and *Image Supplies, Inc. v. Hillmert,* 71 Ill.App.3d 710, 28 Ill.Dec. 710, 713–714, 390 N.E.2d 68, 71–72 (1979). *See also Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972); *Altana, Inc. v. Schansinger,* 111 App.Div.2d 199, 489 N.Y.S.2d 84 (1985); and *Cambridge Filter Corp. v. International Filter Co., Inc.,* 548 F.Supp. 1301 (D.Nev.1982, applying California law).

But we need not determine that particular issue. While a true trade secret is entitled to protection of indefinite duration, *Jager, supra* at § 13–03, pp. 13–14; *Epstein, supra* at pp. 31–32, the same is not true of customer information, especially in a field where customers are known and generally accessible to competitors.

██ Here, paragraph 6 of the Employment Agreement simply boils down to a noncompetition covenant, which is wholly without temporal limitation. It is accordingly invalid. *Wright v. Palmer,* 11 Ariz. App. 292, 464 P.2d 363 (1970); *Sermons v. Caine & Estes Ins. Agency, Inc.,* 275 S.C. 506, 273 S.E.2d 338 (1980); *Annot.* 41 A.L. R.2d 15, 218 (1955); and *see generally 1 Milgrim on Trade Secrets* §§ 3.02[2] and 3.05.

## VI. THE NONCOMPETITION COVENANT

The subject agreement included a severability clause reading as follows:

*Severability* :

If any court of competent jurisdiction rules that any portion of this Agreement is invalid for any reasons, the remainder of the Agreement shall remain in full force and effect and shall not be affected thereby.

Subparagraph 10a of this agreement is a keystone. The provisions regarding damages in subparagraph 10b are dependent upon it and, if it is eliminated, nothing remains to be enforced in this action. The first question, then, is whether subparagraph 10a is overbroad as written. If it is, the remaining question is whether the overbroad portion or portions may be severed so that what remains is intelligible and enforceable.

██ Plainly, appellant can have no protectable interest in denying Mascari the right to compete for a customer it last serviced 35 months ago, and which Mascari never knew. To argue to the contrary would be frivolous, and we do not understand appellant to do so. It is clear that the subparagraph, as a whole, is overbroad.

The next question is whether, with the last clause deleted, the remainder of the subparagraph can stand.

We note in passing that, with respect to the activities proscribed, recent cases raise a substantial question as to whether Mascari could be prohibited from servicing Amex customers other than those with

which he did business, or concerning which he acquired significant customer information. These cases limit the employer's protectable interest to those customers to whom the employee represented the employer's goodwill. *NCH Corp. v. Share Corp*, 757 F.2d 1540, 1543 (5th Cir.1985, Texas law); *USAchem, Inc. v. Goldstein*, 512 F.2d 163, 168 (2nd Cir.1975, New York or Texas law); *NCR Corp. v. Rotondi*, 88 App.Div.2d 537, 450 N.Y.S.2d 198 (1982); and *see Barnes Group, Inc. v. Harper*, 653 F.2d 175 (5th Cir.1981, Georgia law) and *UARCO, Inc. v. Eastland*, 584 F.Supp. 1259, 1262 (D.Kan.1984), upholding restrictions as so limited. We read *James S. Kemper & Co. Southeast, Inc. v. Cox & Associates Inc.*, 434 So.2d 1380 (Ala.1983), discussed at length in *Olliver/Pilcher, supra*, as essentially in accord, because the employee Tillery in *Kemper* was in charge of all Alabama operations and received commissions for all business written in the state, and the injunction issued was limited to "signed customers and the quoted prospects; that is, only those people and companies, and the information about them, obtained by the very work Tillery was paid to do while employed to do by Kemper." 434 So.2d at 1383. As to these customers in which Tillery was involved, the court stated that Kemper had a "work product investment." 4343 So.2d at 1384.

We pass that issue, however, and focus upon the first part of subparagraph 10a, which prohibits Mascari from competing with Amex for 36 months. Mascari argues that the prohibition is invalid because there can be no legitimately protectable interest in eliminating competition *per se*, because the duration of the covenant is too long, and because there is no spatial limitation.

The proposition that one may not merely seek to eliminate competition *per se* is valid, *see 6A Corbin on Contracts* § 1394, p. 100 (1962), but what the principle means in practice is that a noncompetition covenant cannot stand when there is no other, valid interest of the employer to protect. The point is well made in *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471 (Tenn.

S.Ct.1984). The principle has no relevance here because close customer contact with the attendant ability to divert customer trade has traditionally been one of the strong justifications for a noncompetition covenant from one through whom the goodwill of the enterprise is developed and exercised. *See Silver v. Goldberger*, 231 Md. 1, 188 A.2d 155 (1963); *Lassen v. Benton*, 86 Ariz. 323, 346 P.2d 137 (1959), *opinion modified*, 87 Ariz. 72, 347 P.2d 1012 (1959).

In our opinion, the duration of this covenant—36 months—has no justification in the evidence. As background, we quote from Professor Blake's widely cited article:

(2) *Time restrictions.*—In determining whether a restraint extends for a longer period of time than necessary to protect the employer, the court must determine how much time is needed for the risk of injury to be reasonably moderated. When the restraint is for the purpose of protecting customer relationships, its duration is reasonable only if it is no longer than necessary for the employer to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers. If a restraint on this ground is justifiable at all, it seems that a period of several months would usually be reasonable. If the selling or servicing relationship is relatively complex, a longer period may be called for. Courts seldom criticize restraints of six months or a year on the grounds of duration as such, and even longer restraints are often enforced.

73 Harvard L.Rev. at 677.

We cannot treat this case as if the covenant had been signed when Mascari first went to work for Amex. By the time Mascari signed the covenant, or even by the earlier date of the agreement, he was not only an experienced "bird-dog," but he had been doing substantial brokering as well. He had been doing some brokering even while Joe James was still with Amex. Ciruli testified that Mascari had received "ex-

tensive" training from himself and Joe James.

Mascari's counsel at the hearing clearly sought to ascertain the nature of the information which was disclosed to Mascari as a result of his signing the employment agreement. The responses elicited included various general examples but in their totality and in their substance they could not justify a prohibition approaching 36 months. Ciruli testified that the training period under Rinella was to be two years. Other evidence indicated that Rinella's teachable experience was basically limited to the shipper end of the business, and that Mascari's learning period could scarcely have taken two years. Customer credit information is not an issue in this case. *Cf. Klamath-Orleans Lumber Co. v. Miller, supra.*

Other evidence, some elicited from Amex's witnesses, indicated that the broker who had been Mascari's assistant was competently meeting the requirements of Amex customers, for example, the Independent Grocers Association of Arizona. This was some five months after Mascari's departure. Amex had no covenant not to compete with either that broker, Sue Ann Harvey, or with Rinella.

Certainly, a covenant of some duration with Mascari was justifiable. Hardship to the employee, however, is one of the factors to be considered in determining reasonableness. *Annot.,* 41 A.L.R.2d 15 at 34, 39–40 (1955). Here, under any reasonable view of the evidence, a covenant could not have extended for three years. Severance is of no avail to appellant, and the entire subparagraph fails.

We comment briefly on three lines of appellant's argument not explicitly treated above. Appellant has argued that Mas-

cari's acknowledgment of the reasonableness of the provisions should be controlling, that the law should encourage the expansion of enterprise, and that it should at least be entitled to protection in respect to the 57 customers in Exhibit 16.

In respect to an employee restrictive covenant the burden is cast upon the employer to prove the extent of its protectable interest. That does not mean that an acknowledgment of reasonableness could not be substantial evidence, and in effect conclusive, in appropriate circumstances. It is not here.

The expansion of enterprise is consistent with public policy within any limits visible here (see Part III above), but for six centuries the law in these restraint of trade cases has sought to protect the individual and society against an improvident relinquishment of the individual's greatest utility. *See Donahue v. Permacel, supra* at 127 N.E.2d 240.

Finally, the blue-pencil rule clearly adopted or reaffirmed in *employment* cases in *Olliver/Pilcher* precludes the alternative request for relief sought with reference to Exhibit 16.[6]

## VII. THE CROSS APPEAL

Mascari seeks by his cross appeal to reverse the trial court's order denying him attorney's fees in the superior court. Mascari relies upon A.R.S. § 12–341.01,[7] and the six factors set forth in *Associated Indemnity Co. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985). He stresses that he prevailed in the trial court because the Amex agreement was contrary to public policy.

Prior to *Olliver/Pilcher,* and notwithstanding the opinion on rehearing in *Lassen v. Benton, supra* at 87 Ariz. 73,

---

**6.** While some courts have moved away from the blue-pencil rule, some of the reasons for doing so seem debatable. *See Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544 (1975). Professor Blake appears to take the view that the blue-pencil rule encourages covenants of "truly ominous" *in terrorem* effect, 73 Harv.L. Rev. at 682–683, but it would seem that the rule requires an employer's counsel to focus upon a bottom line of post-serverance validity and that

the burden is placed upon counsel rather than the court to fashion a legitimate restriction. A covenant exacted other than in good faith would be subject to attack on that basis alone. *See Lassen v. Benton, supra* at 86 Ariz. 328, 346 P.2d at 140.

**7.** The contract itself provided for attorney's fees only for Amex.

347 P.2d 1012, there were some indications that Arizona might permit judicial modification of this kind of restrictive covenant. *See Esmark, Inc. v. McKee, supra; Snelling & Snelling v. Dupay Enterprises, Inc.,* 125 Ariz. 362, 364, 609 P.2d 1062 (App.1980); and *Three Phoenix Co. v. Pace Industries, Inc.,* 135 Ariz. 126, 131–132, 659 P.2d 1271 (App.1981), *vacated and reversed on other grounds* by the supreme court in *Three Phoenix Co. v. Pace Industries, Inc., supra.* Even though these were business transfer cases, we believe they provided some basis for Amex to believe that the provisions in the agreement might be pared where unreasonable and enforced *pro tanto.* Since the trial court's discretion with respect to attorney's fees is broad, *Autenreith v. Norville,* 127 Ariz. 442, 622 P.2d 1 (1980), we believe that the foregoing provides a basis for upholding the trial court's decision, and we do so.

### VIII. ATTORNEY'S FEES ON APPEAL

 Mascari seeks attorney's fees on appeal. Our attention is accordingly directed to *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025, 1049 (1985), where the supreme court indicated that the *Associated Indemnity v. Warner* criteria is also applicable in the appellate court.

Here, however, our task is different from that of ascertaining whether a basis existed for the trial court's exercise of discretion. We must at this point exercise our own discretion based upon the factors enumerated in *Warner* and *Wagenseller.*

Running through the criteria as it is enumerated in *Wagenseller* at 147 Ariz. 394, 710 P.2d 1049, we respectively observe that (1) Amex at best had a tough legal row to hoe with provisions of either unlimited or very generous backward and forward duration in its agreement; (2) Mascari could not have avoided the appellate litigation, which he offered to settle with a stipulated dismissal with each party bearing its own attorney fees; (3) there is no indication of extreme hardship in assessing fees against Amex; (4) Mascari prevailed in respect to all of the relief he sought except in respect to his cross-appeal; (5) prior to *Olliver/Pilcher,* rendered after the briefing in this case, a critical aspect of this litigation may have been considered in some doubt; and (6) employers should not be discouraged in the future from litigating legitimate claims arising out of agreements drawn with a clear view to their validly protectable interests and with restraints no greater than necessary to protect those interests.

Here, it must be acknowledged that appellant has presented a generally well-argued brief on appeal, including some authorities in support of its position in a field as fraught as any with conflicting decisions rendered over the years. A large number of those authorities are from California, one of a handful of jurisdictions where covenants not to compete have been prohibited by statute, and the leading jurisdiction in finding trade secret violations in the "route" cases. *1 Milgrim on Trade Secrets* § 2.09[7] at pp. 2–188 and 2–203. Many of appellant's cases are of 1940s and 1950s vintage. Weighing all of the factors, including an arguable lack of a definitive recent adjudication on modification or blue-penciling prior to *Olliver/Pilcher (Warner-Wagenseller* criterion No. 5), we believe that justice is served by granting appellee's request for attorney's fees in this court. The prospect that this jurisdiction would firmly adopt or adhere to and apply a covenant-destroying blue-pencil rule was a clearly appreciable risk of appellate litigation. The amount of attorney's fees will be determined pursuant to ARCAP Rule 21(c) and *Schweiger v. China Doll Restaurant, Inc.,* 138 Ariz. 183, 673 P.2d 927 (App.1983).

### CONCLUSION

The judgment of the trial court is in all respects affirmed and appellee shall recover his attorney's fees on appeal.

GRANT, P.J., and BROOKS, J., concur.

RICHARD M. DAVIS, J. Pro Tem., of a court of record, has been authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Ariz. Const. art. VI, § 31.