**MERRILL LYNCH, PIERCE, FENNER & SMITH INC., Plaintiff,**

v.

**Ross T. McCLAFFERTY, Defendant.**

**No. CIV.03–00504 SPK/BMK.**

United States District Court, D. Hawai'i.

Sept. 26, 2003.

Theodore D. Young, Cades Schutte Fleming & Wright, Honolulu, HI, Jason T. Edelmann, Joseph A. Dougherty, Rubin & Associates, P.C., Paoli, PA, for Merrill Lynch, Pierce, Fenner & Smith Inc., plaintiff.

Francis P. Hogan, Kevin W. Herring, Jody Kaulukukui Li, Ashford & Wriston, Honolulu, HI, for Ross T. McClafferty, defendant.

## ORDER GRANTING PLAINTIFF'S REQUEST FOR TEMPORARY RESTRAINING ORDER

MOLLWAY, District Judge.

### I. INTRODUCTION

On September 24, 2003, Plaintiff Merrill Lynch, Pierce, Fenner & Smith Inc., filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to enjoin Defendant Ross T. McClafferty from violating portions of his employment agreement with Merrill Lynch. The court[1] heard the matter on September 26, 2003. Theodore Young, Esq., appeared for Merrill Lynch. Francis Hogan, Esq., appeared for McClafferty. For the reasons set forth below, the Court GRANTS Plaintiff's Request for a Temporary Restraining Order ("TRO").[2]

---

1. Although the complaint has been assigned to the Honorable Samuel P. King, the motion was heard and decided by the Honorable Susan Oki Mollway. Judge King is presently out of the country and therefore unavailable to handle these proceedings on an expedited basis.

2. As indicated at oral argument by counsel for Merrill Lynch, Merrill Lynch has withdrawn its request for a preliminary injunction, given the relief in this TRO and the pending arbitration proceedings.

## II. BACKGROUND

McClafferty was employed by Merrill Lynch as a financial advisor, beginning in May of 1992. Verified Complaint ¶ 5. He resigned from Merrill Lynch last Friday, September 19, 2003, and immediately went to work for the Smith Barney Division of Citigroup Global Markets, Inc. *Id.* ¶ 19. Smith Barney competes with Merrill Lynch for business. McClafferty's resignation apparently came as a surprise to Merrill Lynch. Affidavit of Scott M. Furukawa ("Furukawa Affidavit") ¶ 7.

When he started working for Merrill Lynch in 1992, McClafferty signed a "Financial Consultant Employment Agreement and Restrictive Covenants" (hereafter "employment agreement"). Exh. "A" to Verified Complaint. The employment agreement provides, among other things, that, for one year after leaving Merrill Lynch, he will not "solicit" "directly or indirectly" any Merrill Lynch account that he serviced or learned about while at Merrill Lynch. *Id.* ¶ 2. McClafferty agreed:

> During my employment and for a period of one year thereafter, not to initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:
>
> (a) to transfer from Merrill Lynch to me or my new employer, or
>
> (b) to open a new account with me or with my new employer, or
>
> (c) to otherwise discontinue its patronage and business relationship with Merrill Lynch.

*Id.*

The employment agreement also specifies that records containing names, addresses, phone numbers, and financial information about customers (including current clients as well as leads or prospects) are "confidential" and "the sole and exclusive property of Merrill Lynch." *Id.* ¶ 1. In the agreement, the parties agree that customer accounts are developed and acquired through a significant expenditure of time and resources and are "deserving of trade secret status and protection." *Id.* Accordingly, McClafferty agreed "not to divulge or disclose this information to any third party and under no circumstances [to] reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter." *Id.* He also agreed not to "remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch." Exh. "A" to Verified Complaint. McClafferty necessarily had access to this information while at Merrill Lynch, and there is some evidence that such information was contained on his personal computer. Exh. "H" to Plaintiff's Motion for Temporary Restraining Order. McClafferty had access to accounts worth more than $75 million in assets under Merrill Lynch management. Furukawa Affidavit ¶ 6.

The employment agreement contemplates potential breaches of these covenants. It states that, if the covenants are breached "[McClafferty] recognize[s] that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo." Exh. "A" to Verified Complaint ¶ 4. If the covenants are breached, McClafferty agrees to "CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION" that (a) orders an immediate return of records and restrains disclosure of information in such records, (b) enjoins for one year solicitation of any Merrill Lynch account that McClafferty serviced or learned about while employed by Merrill Lynch, and (c) enjoins him from "accept-

ing business from any Account" that was improperly solicited or whose records and information were improperly disclosed. *Id.* ¶ 4 (uppercase in original).

Under the agreement, a court of competent jurisdiction determines whether such an injunction should issue. *Id.* ¶ 5. Rule 10335(a) of the National Association of Securities Dealers Code of Arbitration Procedure also gives Merrill Lynch the right to seek injunctive relief in court pending subsequent arbitration proceedings.[3] Although the agreement itself does not appear to require arbitration, Rule 10335 does appear to require it. That is, if the court issues a TRO, the parties are required to submit to an expedited arbitration hearing on a request for permanent injunctive relief and to otherwise arbitrate the underlying merits of the dispute. *See* Rule 10335(b). Merrill Lynch has initiated such arbitration proceedings.

### III. STANDARD FOR A TRO

■ The standard for obtaining a TRO is well known. "[T]o obtain a TRO, a party must demonstrate either: 1) probable success on the merits and irreparable injury; or 2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief." *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993).

These two formulations represent two points on a sliding scale, with the required degree of irreparable harm increasing as the probability of success decreases. *Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 456 (9th Cir.

1994). These formulations are not separate tests, but the extremes of a single continuum. *Los Angeles Mem'l Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir. 1980). "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Alaska v. Native Vill. of Venetie,* 856 F.2d 1384, 1389 (9th Cir.1988) (quoting *Aguirre v. Chula Vista Sanitary Serv.,* 542 F.2d 779 (9th Cir.1976)). If the plaintiff shows no chance of success on the merits, the injunction should not issue. Moreover, under any formulation, the moving party must demonstrate a "significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir.1987).

*Arakaki v. Cayetano,* 198 F.Supp.2d 1165, 1173 (D.Haw.2002) (internal footnote omitted).

### IV. ANALYSIS

A. *Merrill Lynch Shows A Likelihood Of Success On The Merits.*

■ Given this standard, the main question before the court is whether there is sufficient evidence to support a likelihood of success on the merits on the critical issue of whether McClafferty is soliciting or has solicited Merrill Lynch's clients or otherwise breached material covenants in the employment agreement.

In this regard, both the verified complaint and affidavit of Scott Furukawa— the administrative manager of Merrill

---

**3.** Paragraph 6 states in part:

If after issuance of a TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION, the parties voluntarily agree, or are ordered, to arbitrate a dispute arising out of this Agreement, each party agrees and demands that

any such arbitration be conducted in strict compliance with the applicable written Rules of Arbitration, as published, amended, effective, and in force at the time of my termination.

Exh. "A" to Verified Complaint ¶ 6.

Lynch's Honolulu office—indicate a substantial likelihood that McClafferty has violated or will violate covenants contained in his employment agreement. Specifically, there is every indication that McClafferty is actively and deliberately contacting and targeting some Merrill Lynch clients whom he serviced or learned about during his employment with Merrill Lynch. The communications are allegedly by mail and by telephone. Furukawa indicates that McClafferty has "sent a targeted mailing to Merrill Lynch clients" and "dispatched this targeted mailing to most, if not all, of the Merrill Lynch clients he formerly serviced." Furukawa Affidavit ¶ 9. Furukawa says he also has learned that McClafferty has placed telephone calls to Merrill Lynch clients "soliciting them to transfer their accounts to Smith Barney." According to Furukawa, "Numerous Merrill Lynch clients have confirmed receiving this solicitation telephone call." Furukawa Affidavit ¶ 10. McClafferty himself states that Smith Barney sent a notice to selected persons, including some Merrill Lynch clients, announcing McClafferty's new affiliation with Smith Barney.

An obvious and logical reason for these communications would be to attempt to solicit or otherwise obtain business for Smith Barney, in direct contravention of the employment agreement. The timing of these communications (conducted immediately after McClafferty's resignation) also suggests that McClafferty could have violated covenants by preparing and possibly sharing confidential information with others prior to leaving Merrill Lynch. These allegations are not substantially contradicted by evidence from McClafferty. At most, McClafferty contends that the communications are not "solicitations" and that he only sent announcements to people on a "personal contacts" spreadsheet. He admits that announcements have been sent to some Merrill Lynch clients but denies that he has sent or will send a "mass mailing." McClafferty Affidavit ¶ 17. He also says that he has made efforts to refrain from actual "solicitation."

The court concludes that Merrill Lynch has established the first requirement for an issuance of a TRO. Merrill Lynch is likely to succeed on the merits. The evidence indicates that McClafferty may have breached covenants in his employment agreement and misappropriated information considered to be an industry "trade secret." Specifically, the evidence indicates that McClafferty used confidential client information to contact and thereby "directly or indirectly" solicit Merrill Lynch's clients to transfer accounts to Smith Barney. McClafferty contends that the contacts were not "solicitations" but merely "wedding-style announcements." Even assuming, however, that such announcements were a matter of professional courtesy, it appears likely that such communications, if directed toward and based on client lists obtained while McClafferty was at Merrill Lynch, violate the covenants.

█ The covenants themselves are valid under Hawaii law. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Strada,* Civ. No. 00–00131HG–FIY, Order Granting Plaintiff's Motion for a Temporary Restraining Order (D.Haw. Feb. 12, 2000) (Gillmor, J.) (interpreting same or similar employment agreement and granting injunctive relief); *UARCO Inc. v. Lam,* 18 F.Supp.2d 1116, 1121–22 (D.Haw.1998) (applying reasonableness analysis); *Technicolor, Inc. v. Traeger,* 57 Haw. 113, 121–23, 551 P.2d 163, 169–70 (1976) (upholding similar post-employment restrictive covenant and applying a "reasonableness" analysis). The restrictions are limited to one year and serve to protect proprietary "trade secret" information. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn,* 191

F.Supp.2d 1346, 1351 (M.D.Fla.2002) (finding Merrill Lynch customer lists and information contained therein to be trade secrets under Florida law); *Morgan Stanley DW Inc. v. Rothe*, 150 F.Supp.2d 67, 76 (D.D.C.2001) (holding that customer lists of financial services firm deserve trade secret status under District of Columbia's Uniform Trade Secrets Act) (citing cases from other jurisdictions); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ran*, 67 F.Supp.2d 764, 775 (E.D.Mich. 1999) (finding same under Michigan Uniform Trade Secrets Act) (citing cases). Hawaii's Trade Secret Act is based on the Uniform Trade Secrets Act and contains the same or a substantially similar definition of "trade secret" as in these cases. *See* Haw.Rev.Stat. § 482B–2. The restrictions do not prevent McClafferty from working for a competitor in his field; they only protect Merrill Lynch's information. The restrictions are reasonable in time and scope.

B. *Merrill Lynch Shows That It Will Be Irreparably Harmed Absent a TRO.*

■ Merrill Lynch will suffer irreparable harm if the covenants are violated. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith Inc. v. Salvano*, 999 F.2d 211, 215 (7th Cir.1993) (finding irreparable harm in a former employee's obtaining of client information and soliciting clients); *Merrill Lynch Pierce, Fenner & Smith Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir.1985) (referring to "irreparable noncompensable harm in the loss of its customers"). The transfer of information is not subject to traditional legal remedies because of the confidential nature of a customer's financial information. "[D]amages could not adequately compensate." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Stidham*, 658 F.2d 1098, 1102 (5th Cir.1981). Indeed, Merrill Lynch has fiduciary duties to protect such information from release to

third parties. Loss in trust and confidence could well result from continued use of confidential information. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith Inc. v. Kramer*, 816 F.Supp. 1242, 1247 (N.D.Ohio 1992) (reasoning that irreparable and immeasurable harm could result in loss of trust and confidence in Merrill Lynch with disclosure of financial information).

■ The balance of hardships also tips strongly in favor of Merrill Lynch. A restraining order protects Merrill Lynch's proprietary information, business operations, and contractual rights. It also serves the public interest. *See id.* at 1248. On the other hand, McClafferty is essentially being held to his contract with Merrill Lynch. Even if, as he argues, he has not breached the contract, injunctive relief to hold him to its terms should not be particularly harmful or unduly burdensome to him. *See also Salvano*, 999 F.2d at 215 ("Although the defendant would likely suffer some harm during the pendency of the TRO ... the denial of the TRO would inflict great injury upon Merrill Lynch"). Persuasive case law in identical circumstances indicates that immediate injunctive relief is necessary to protect against potential damage for violations of nonsolicitation clauses. *See Merrill Lynch, Pierce Fenner & Smith Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985) ("An injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be 'unsolicited.'").

McClafferty argues that Merrill Lynch has an ongoing duty towards its clients and cannot interfere with the client's choice of a broker. If the client chooses (without solicitation) to be serviced by McClafferty and Smith Barney, then Merrill Lynch cannot interfere, and, in fact, has an obligation to expedite and coordinate such a transfer. *See* NASD Rule

11870(a); NASD Notice to Members 02–07. In this regard, the court agrees with McClafferty. Nevertheless, the balance of hardships still tips in favor of Merrill Lynch, at least as to use of Merrill Lynch client lists or information.

The court, however, emphasizes that this TRO does not enjoin Merrill Lynch clients from transferring accounts to, or starting new accounts with, Smith Barney. Indeed, Merrill Lynch has not asked for such relief and, in any event, the record now before the court would not support it. Rather, the evidence indicates a clear likelihood of success on the merits that further communications—whether by the "wedding style announcement" at Exhibit "A" of McClafferty's opposition memorandum or by telephone—initiated by McClafferty towards present Merrill Lynch clients would violate restrictive covenants in the employment agreement.

The court has not addressed (and has no evidence before it regarding) whether section 4(c) of the employment agreement should prevent McClafferty from accepting business from Merrill Lynch clients whom he serviced previously and to whom he might have made telephone calls or sent announcements. That is, the record is clearly insufficient for the court to decide (and the court has not been asked to decide) whether people who might have received announcements should now be precluded from doing business with McClafferty or Smith Barney. Such persons may or may not have intended to transfer their accounts even absent any solicitation. Presumably, such questions are matters for arbitration. This does not, however, diminish the force of the evidence indicating that Merrill Lynch is entitled to a TRO enjoining McClafferty from directing further announcements or other communications toward Merrill Lynch clients for the purpose of "inviting, encouraging or requesting," as set forth in paragraph 2 of the employment agreement.

## V. CONCLUSION

The Court therefore GRANTS Merrill Lynch's Motion for Temporary Restraining Order. Defendant Ross T. McClafferty is enjoined and restrained, directly or indirectly, whether alone or in concert with others, from:

(a) soliciting or otherwise initiating any further contact or communication with any client of Merrill Lynch whom McClafferty serviced or whose name became known to McClafferty while employed by Merrill Lynch for the purpose of advising the client of his new affiliation or for the purpose of inviting, encouraging, or requesting the transfer of any accounts or business patronage from Merrill Lynch (excluding McClafferty's family or relatives);

(b) soliciting or otherwise initiating any further contact or communication with any client of Merrill Lynch whose records or information McClafferty used in violation of paragraph 1 of the employment agreement at Exhibit A to the Verified Complaint. This includes any client whom McClafferty may have contacted by mail, phone, or otherwise through the use of any information obtained by McClafferty while employed by Merrill Lynch (excluding McClafferty's family or relatives);

(c) using, disclosing, or transmitting for any purpose, including solicitation of clients, the information contained in the records of Merrill Lynch or concerning its clients, including, but not limited to, the names, addresses, and financial information of clients; and

(d) destroying, erasing, or otherwise making unavailable for further proceedings in this matter, or in any arbitration proceeding between the parties, any rec-

ords or documents, if any, (including data or information maintained in computer media) in McClafferty's possession or control that were obtained from or contain information derived from any Merrill Lynch records, that pertain to Merrill Lynch clients whom McClafferty serviced or whose names became known to McClafferty while employed by Merrill Lynch, or that relate to any of the events alleged in the complaint in this action.

Further, McClafferty, and anyone acting in concert or participation with McClafferty, specifically including his counsel and any agent, employee, officer, or representative of his new employer, Smith Barney, are ordered to return to Merrill Lynch's Hawaii counsel all records, documents, and/or other types of information pertaining to Merrill Lynch customers ("customer information"), if any, whether in original, copied, handwritten, computerized (including on computer software, disks, computer hard drive and/or any other type of computer or digital information storage device) or memorialized in any other form, within one business day (24 hours) of notice to McClafferty of his counsel of the terms of this Order.

Any and all "customer information" within the possession, custody, or control of McClafferty that is contained in any computerized form, including on computer software, disks, computer hard drive, and/or any other type of computer or digital information storage device, returned pursuant to the preceding paragraph shall be permanently deleted, if possible without affecting any other information or software on the computer. McClafferty, and anyone acting in concert with McClafferty, is precluded from reconstituting or in any way restoring any "customer information" deleted pursuant to this paragraph and returned to Merrill Lynch under the preceding paragraph. However, McClafferty is not enjoined from using computers from which he, in good faith, believes Merrill Lynch data have been deleted.

The court is not enjoining current or former Merrill Lynch clients from doing business with Smith Barney. As stated earlier, this order is not intended to address the effect, if any, of paragraph 4(c) of the employment agreement on clients who might have received the announcement at Exhibit "A" to McClafferty's opposition memorandum.

Because expedited arbitration proceedings are to take place within 15 days, this Order remains in full force and effect until October 14, 2003 unless the parties stipulate otherwise.

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, the parties are directed to an arbitration proceeding pursuant to Rule 10335(b) of the National Association of Securities Dealers Code of Arbitration Procedure.

IT IS SO ORDERED.