**COMPASS BANK, an Alabama state banking corporation, Plaintiff,**

v.

**Kenneth R. HARTLEY, Jr. and Kelly Hartley, husband and wife; and Erisey Wealth Management, LLC, an Arizona limited liability corporation, Defendants.**

No. CV 06–0402 PHX ROS.

United States District Court, D. Arizona.

April 28, 2006.

---

Lawrence Jay Rosenfeld, Michael Cajer Mason, Greenberg Traurig LLP, Phoenix, AZ, for Plaintiff.

Kimberly A. Fatica, Brockelman Fatica PLC, Tempe, AZ, for Defendants.

## ORDER

SILVER, District Judge.

On February 3, 2006, Plaintiff filed its Complaint as well as a Motion For Preliminary Injunction (Doc. # 2). Defendants filed an answer on February 27, 2006 (Doc. # 37) and a Response to Plaintiff's Motion For Preliminary Injunction on March 3, 2006 (Doc. # 3). A preliminary injunction hearing was held on March 10, 2006 and March 16, 2006. For the reasons set forth below, Plaintiff's motion will be granted. The parties are ordered to submit a joint statement of proposed injunctive relief within seven days from this Order.

## I. BACKGROUND

This case arises out of several agreements entered into between Plaintiff Compass Bank ("Compass") and its former employee Kenneth R. Hartley ("Hartley") containing certain post-employment restrictive covenants. Compass filed a motion for preliminary injunction seeking enforcement of the covenants, and other injunctive and monetary relief, against former employee Hartley and the company he founded, Erisey Wealth Management, LLC ("Erisey").

The following agreements are at issue:

(1) *February 19, 2001 Offer Letter—* This letter purports to offer Hartley employment with Compass as a Senior Portfolio Manager on certain terms and conditions, including a post-employment non-solicitation covenant for two years. *See* Pl. Exh. 6. Hartley signed and returned this offer on February 21, 2001.

(2) *2001 Stock Option Agreement.*[1] *See* Pl. Exh. 1

(3) *2002 Stock Option Agreement. See* Pl. Exh. 2.

(4) *2003 Stock Option Agreement. See* Pl. Exh. 3.

---

1. Section 8(g) of the 2004 and 2005 Stock Option Agreements provides that "[t]his Section 8 replaces section 8 in all stock option agreements between the Corporation and the Employee entered into as of a date prior to the date of this Agreement. All such prior agreements are hereby amended to include this Section 8 in place of section 8 in any such prior agreements. All other provisions in all such prior agreements are unaffected by this amendment." Thus, for purposes of determining Hartley's existing obligations under the 2001–2005 Stock Option Agreements and the validity of such agreements, the Court need only analyze those covenants and restrictions set forth in Section 8(g) of the 2005 Agreements.

(5) *2004 Stock Option Agreement.* Dated April 20, 2004, this agreement contains both non-solicitation[2] and non-disclosure[3] covenants for a duration of 2 years/18 mo./12 mo. (step-down provisions). It also contains a loyalty provision.[4] By its terms, this Agreement amends all earlier stock option agreements by replacing the restrictive covenants in those earlier agreements with the restrictive covenant in the 2004 Agreement, such that the restrictive covenants in the 2001–2004 Agreements also contain the step-down provisions. *See* Pl. Exh. 4.

(6) *2005 Stock Option Agreement.* Dated April 15, 2005, this agreement contains non-solicitation,[5] non-compete,[6] and non-disclosure[7] covenants, as well as a loyalty provision,[8] as set forth in Section 8 for 2 years/18 mo./12 mo. (step-down provisions). *See* Pl. Exh. 5.

2. Section 8(b)(i) provides that the employee "[w]ith respect to any type of product or service offered by or available from the Company, solicit, directly or indirectly, or do business with any customer of the Company called on, serviced by, or contacted by the Employee in any capacity, or otherwise known to the Employee by virtue of the Employee's Company or any state in which both the customer and the Company do business. For purposes of this Section 8(b)(i), "customer" is limited to those persons or entities that are current customers of the Company at the time Employee's employment relationship with Company in the twelve months preceding the end of Employee's employment relationship with the Company . . . ."

3. Section 8(c) provides that in exchange for confidential information, Employee agrees "not to use, divulge, or furnish or make accessible to any third party, company, corporation or other organization . . . . any trade secrets, customer lists, information regarding customers, information regarding Compass' relationships with specific existing or prospective customers, customer goodwill associated with Compass' trade name, or other valuable confidential and proprietary information concerning the Company or its business, including . . . . customer lists. Employee warrants and agrees that every customer whom Employee services in any way while employed at the Company is a customer of the Company and not a customer of Employee, individually. Employee agrees that such information remains confidential even if committed to Employee's memory."

4. Section 8(a) provides that ". . . . [e]mployee will devote his or her entire time, energy and skills to the service of the Company."

5. Section 8(b)(i) provides that Hartley shall not "[c]arry on or engage in a business that competes with the business of the Company within 50 miles (and if 50 miles is determined by a court to be overly broad, then 25 miles) of any city where Employee engaged in business . . . ., Employee had responsibility . . . ., other employees that were supervised by Employee worked . . . ., or Employee otherwise conducted business for the Company . . . ."

6. Section 8(b)(ii) provides that "[w]ith respect to any type of product or service offered by or available from the Company, [Hartley shall not] solicit, directly or indirectly, or do any such business with any customer of the Company called on, serviced by, or contacted by the Employee in any capacity or otherwise known to the Employee by virtue of the Employee's employment with the Company, in any state in which the Employee was employed by the Company or any state in which both the customer and the Company do business. For purposes of this Section 8(b)(ii), "customer" is limited to those persons or entities that are current customers of the Company at the time Employee's employment relationship with the Company ends as well as those persons or entities who were customers of the Company in the twelve months preceding the end of the Employee's employment relationship with the Company . . . ."

7. The non-disclosure provision contained in the 2005 Agreement is virtually the same as that contained in the 2004 Agreement and contains no material differences.

8. The loyalty provision contained in the 2005 Agreement is virtually the same as that contained in the 2004 Agreement and contains no material differences.

(7) *2004 Promotion Letter.* Dated September 24, 2004, this letter purports to confirm Hartley's promotion to Executive Vice President of the Wealth Management Group pursuant to the terms and conditions therein; it contains no restrictive covenants. *See* Pl. Exh. 7.

## II. PRELIMINARY INJUNCTION STANDARD

■ Under Ninth Circuit law, the traditional equitable criteria for granting preliminary injunctive relief are: (1) a strong likelihood of plaintiff's success on the merits; (2) the threat of irreparable harm to plaintiff if the injunction does not issue; (3) the relative balance of harm to the parties; and (4) the public interest. *See Los Angeles Memorial Coliseum Commission v. National Football League, et al.,* 634 F.2d 1197, 1200 (9th Cir.1980). Because this is a diversity action, Arizona law governs the substantive aspects of the case.[9]

## III. ANALYSIS

### A. Likelihood of Success

### 1. The Validity of the Covenants

#### a. Ancillarity[10]

■ "In Arizona .... a restrictive covenant .... must fall within the requirements of a valid contract, and it must be incidental or ancillary to an otherwise legally enforceable contract." *Am. Credit Bureau v. Carter,* 11 Ariz.App. 145, 462 P.2d 838, 840 (1969). The signing of an otherwise valid restrictive covenant at the inception of a written at-will employment relationship is but one way to establish "ancillarity" and sufficiency of consideration. *Lessner Dental Labs. v. Kidney,* 16 Ariz.App. 159, 492 P.2d 39, 40 (1971). In addition, the promise of continued employment validates a covenant executed after the employment relationship has commenced, even where it continues to be on an at-will basis. *See Mattison v. Johnston,* 152 Ariz. 109, 730 P.2d 286 (App. 1986).

9. Both parties cite to state law as set forth in *Phoenix Orthopaedic Surgeons, Ltd. v. Peairs,* 164 Ariz. 54, 790 P.2d 752, 756 (App.1989) as the applicable standard for preliminary injunctions. Although there is confusion over whether to utilize a federal or state law standard in examining requests for preliminary injunctions in diversity actions, in this case, federal law applies because the state law is not outcome-determinative under the Erie doctrine. *See Sullivan By and Through Sullivan v. Vallejo City Unified School District,* 731 F.Supp. 947, 956 (E.D.Cal.1990), *relying on Sims Snowboards, Inc. v. Kelly,* 863 F.2d 643 (9th Cir.1988) (applying state anti-injunction statute to determine whether equitable remedy is available in a diversity action); 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2943.

10. Defendants argue that the 2004 Promotion Letter, which contained no restrictive covenants, superseded the 2001 Offer Letter, which contained a non-solicitation provision, and that as a result, Hartley is relieved of his obligations under the first letter. Defendants further argue that the "otherwise enforceable agreement" to which the stock option agreements are ancillary must also contain a covenant in order to establish that it gives rise to an interest worthy of protection. However, as argued by the Plaintiff, if the Court finds that the promise of continued employment is sufficient to establish ancillarity, then it makes no difference whether the 2004 Promotion Letter superseded the 2001 Offer Letter, because the "otherwise valid agreement" for purposes of ancillarity is the employment relationship itself. Thus, the Court need not reach this issue. This argument is incorporated in *Olander v. Compass Bank,* 44 Fed. Appx. 651 (2002) (unpublished) and is rejected by this Court (see discussion herein). Further, it is noteworthy that there is no question that Hartley was aware of this obligation pursuant to the restrictive covenants, because he applauded the efficacy of each covenant in company memoranda he drafted. *See* Pl. Exh. 30.

■ Hartley agreed to restrictive covenants as part of his 2001 Offer Letter [11] and annual stock option agreements. Pursuant to the terms of the stock option agreements, the consideration for the grant of stock options was the promise not to compete or solicit, but the covenants are valid for another reason. Under Arizona law Compass has the right to require at-will employees to sign the restrictive covenants as a condition of continued employment. *See Am. Credit Bureau,* 462 P.2d at 840 (holding that continued at-will employment of defendant by plaintiff for three years at a sizeable salary constitutes sufficient consideration to support a non-competition agreement); *Amex v. Mascari,* 150 Ariz. 510, 724 P.2d 596, 602 (App. 1986) (finding ancillarity sufficient to enforce restrictive covenant where employment agreement clearly contemplated a substantial promotion). For this reason, the restrictive covenants contained in the stock option agreements are ancillary to Compass' promise of continued employment, regardless of whether Hartley exercised them or not. *See Field v. Alexander & Alex.* 503 N.E.2d 627, 631 (Ind.App. 1987) (holding that restrictive covenants in a stock option agreement ancillary to the employment relationship and the stock options were consideration whether or not they were exercised); *Campbell Soup Co. v. Desatnick,* 58 F.Supp.2d 477, 492 (D.N.J.1999).

Defendant relies on *Olander v. Compass Bank,* 44 Fed.Appx. 651 (2002) (unpublished), which is distinguishable on several grounds. Significantly, *Olander* is not good law in Arizona, because it relies on the reasoning set forth in *Light v. Centel Cellular Company of Texas,* 883 S.W.2d 642, 647 (Tex.1994) which rejects the Restatement that is followed in Arizona. Under the Restatement, "a legitimate restraint may be ancillary to a transaction or relationship, and not necessarily a contract per se." *Id.* (citing *Business Electronics v. Sharp Electronics,* 485 U.S. 717, 729 n. 3, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)). The *Light* court held that a covenant must be ancillary to an "otherwise enforceable *agreement,*" requiring that the restraint enforce a contractual obligation of one of the parties, not merely the employment relationship. *Id.* (emphasis added).

### b. Reasonableness

■ A covenant not to compete is generally enforceable as long as it is no broader than necessary to protect an employer's legitimate business interests. *See generally* Restatement (Second) of Contracts, §§ 186–188. The burden is on the employer to prove the extent of its protectable interests, and if it cannot, the entire covenant will be deemed unenforceable.

Based principally on the testimony of Brian Coughlan ("Coughlan") and Hartley, the Court finds that one year is long enough for a new Portfolio manager to gain the requisite confidence of clients to entrust the manager with his investments. Although Charles Watts, Coughlan, and John Sawyer all directly or impliedly testified that it would take at least two years to gain a customer's trust sufficient for maintaining a customer's account, Coughlan was not afforded a real opportunity to do so because none of Hartley's accounts had been fully transferred to him. In addition, Coughlan testified that he had successfully established relationships with the few clients who were transferred to him while

---

**11.** The restrictive covenant contained in the 2001 Offer Letter was for a duration of two years. As discussed below, the Court finds that two years is unreasonable, and because the covenant does not contain a step-down provision, it is unenforceable. However, because the Court finds that the other covenants contained in the Stock Option Agreements are valid, the invalidity of the 2001 Offer Letter is irrelevant.

Hartley was with Compass and after Hartley left.

The Court is also persuaded that under Arizona law, two years is unreasonable. In nearly all of the breach of contract cases filed in 2003–2005 in the District of Arizona involving the requested enforcement of post-employment restrictive covenants in the financial-services industry, the duration requirements are only for one year. *See e.g., Citigroup Global Markets Inc. v. Early, et al.,* Case No. CV 05–00709 (D. Ariz. filed November 30, 2005) (financial company seeking, among other things, enforcement of one-year non-solicitation provision contained in a "Franchise Protection Program Agreement"); *Chase Investment Services Corp. v. Tolan, et al.,* Case No. 05–03872 (D. Ariz. filed November 30, 2005) (financial company seeking, among other things, enforcement of one-year non-solicitation provision contained in a "Supervision, Confidentiality and Non-Solicitation Agreement"); *Merrill Lynch, Pierce, Fenner & Smith v. Brown et al.,* Case No. 05–00513 (D. Ariz. filed August 23, 2005) (financial company seeking, among other things, enforcement of one-year non-solicitation provision contained in a "Financial Consultant Employment Agreement and Restrictive Covenants").

With regard to the geographical scope of the covenant, Plaintiffs stated that should the Court find the covenant otherwise valid, 25 miles would be deemed reasonable. The Court finds the geographical location reasonable, but because the duration and scope provisions are unreasonable, the entire covenant is invalid unless the Court finds the step-down provisions are an acceptable application of Arizona's blue-pencil law.

#### c. Blue–Penciling and Step–Down Provisions

■ Both the non-solicitation and non-competition covenants were drafted in an attempt to fit within Arizona's "blue pencil" rule, whereby a court is empowered to cross out over broad, unreasonable provisions in an agreement while keeping in place less onerous, enforceable ones. *Valley Medical Specialists v. Farber,* 194 Ariz. 363, 982 P.2d 1277, 1286 (1999) ("Arizona courts will 'blue pencil' restrictive covenants, eliminating grammatically severable, unreasonable provisions."). In an effort to take advantage of Arizona's adoption of the blue-pencil rule, employers now frequently include step-down provisions within their non-compete clauses such as the one here. Whether step-down provisions are enforceable in Arizona is an issue of first impression. But previous decisions in Arizona and other jurisdictions suggest that it would be an acceptable application of Arizona's blue-pencil law in this case. *See id.; Varsity Gold, Inc. v. Porzio,* 202 Ariz. 355, 45 P.3d 352, 359 (finding that Arizona courts could cross out restrictive covenants to eliminate grammatically severable, unreasonable provisions and preserve valid portions of the agreement); *see also* Ali J. Farhang & Ray K. Harris, *Non–Compete Agreements With Step–Down Provisions,* Arizona Attorney, December 2005.

In *Farber,* the Arizona Supreme Court addressed the enforceability of a non-compete clause prohibiting a departing physician from practicing medicine within a five-mile radius of any of three specific clinic locations for a period of three years. *Valley Medical Specialists v. Farber,* 194 Ariz. 363, 982 P.2d 1277 (1999). The contract also had a reformation clause that allowed a court, if necessary, to amend the non-compete provision to make it enforceable. Despite the latter clause, the Court held that the non-compete was unenforceable because both the scope and duration were unreasonable, and the reformation

clause did not permit the appellate court to rewrite the non-compete provision "in an attempt to make it enforceable." *Id.* at 1286. The Court explained that "[u]nder Arizona law, courts may blue-pencil a covenant by eliminating grammatically severable, unreasonable provisions, but they are prohibited from adding or rewriting provisions."

In *Varsity Gold,* the non-competition clause prohibited the employee from "competing with Varsity in 'the state of Pennsylvania or any contiguous state." 45 P.3d at 352. Like *Farber,* it also contained a reformation clause. The trial court found the non-competition provision unenforceable and amended the scope to the south Pittsburgh area for the duration of one year. The Court of Appeals disagreed, stating that any judicial reformation beyond implementation of the blue-pencil rule is a "significant modification of that provision that cannot be tolerated." *Id.* at 358–59, 982 P.2d 1277.

 In light of these cases, the Court finds under limited circumstances carefully crafted that step-down provisions are a permissible application of Arizona's blue-pencil rule, if they permit a Court to cross-out some unreasonable sections in favor of more reasonable ones without rewriting them. Unlike *Varsity Gold* where the parties did not know what a reasonable provision would include, step down provisions provide the parties with several scenarios that may be found reasonable. In this sense, it affords parties an opportunity to contemplate several options at the time the contract is signed. If a court subsequently finds the covenant unreasonable and uses the step-down provision to amend the covenant, such a modification is not significant because it has already been contemplated. Thus, there was a meeting of the minds at the initiation of the contract with regard to the alternatives presented by the step-

down provision. On the other hand, if the alternatives presented are indefinite and inconsistent with the underlying provision, and are not easily severable from unreasonable provisions, there is no meeting of the minds and the covenant is invalid. That is not the case here. The step-down provision includes a narrow duration range of 1–2 years and a reasonable geographical scope of 25–50 miles. The agreement was drafted in good faith and is an acceptable application of Arizona's blue-pencil law.

Based on the foregoing, the covenant is saved by the step-down provisions allowing the Court to limit its duration to one-year and a scope of 25 miles.

## 2. Whether Hartley Violated The Enforceable Covenants

### a. Solicitation

 Hartley's letter, which was written subsequent to his voluntary termination, was sent to 56 Compass clients and contained the following announcement:

> Effective 12.01.05 Kenneth R. Hartley Jr., CFA, has joined our firm as: President and Chief Investment Officer

It also contained two telephone numbers, an e-mail address, and Erisey's new address.

The Court finds that the letter constitutes a solicitation not only because it was a targeted mailing, but because it contained contact information initiating customers to call/e-mail/write Hartley. *See Alpha Tax Services, Inc. v. Stuart,* 158 Ariz. 169, 761 P.2d 1073, 1075 (App.1988) (finding that certain mailings addressed personally to customers constituted solicitations, where the notice contained an announcement of the opening of the service and a discount if the customer availed

himself of their service);[12] *Merrill Lynch, Pierce, Fenner & Smith v. McClafferty,* 287 F.Supp.2d 1244, 1248 (D.Haw.2003) (holding that a "wedding-style announcement," even assuming it was sent as a matter of professional courtesy, was a solicitation where it was directed toward and based on client lists). Indeed, under Arizona law, it may be sufficient that the communication is targeted. *See Merrill Lynch v. Schultz, III,* 2001 WL 1681973 (D.D.C. Feb.26, 2001) (finding that the defendant's announcement of his resignation constitutes a solicitation because of his "initiation of targeted contact through the use of client information gained through his employment").

Hartley contends that the fact that it was sent to customers is not determinative. *See McCallister Co. v. Kastella,* 170 Ariz. 455, 825 P.2d 980, 981 (App.1992) (holding that the targeted announcement did not constitute a solicitation). The announcement in *Kastella* is distinguishable, however, because it did not contain contact information and merely announced the employee's intent to resign. More importantly, however, the court focused on other information to determine the defendant's intent to solicit.

Here, additional evidence shows that Hartley intended to solicit. Hartley testified that immediately upon resigning with Mr. Bill Helms, Executive Officer of the Wealth Management Group in Houston, he instructed his wife to mail the pre-addressed and prepared Federal Express envelopes containing the announcements.

The letters were overnighted and received by customers the very next day, which was Hartley's last day at Compass. In addition, there was evidence, including Hartley's and Coughlan's testimony and the October 13, 2004 letter from Hartley to client Steve Carothers (Pl.Exh. 18), that Hartley delayed transferring clients to Coughlan despite his 2004 promotion and agreement to do so. This supports the inference that Hartley intended to maintain a close relationship with clients in the event he left Compass to start Erisey. The Court finds that Hartley intended to solicit Compass customers.

### b. Non-disclosure

 The non-disclosure provision contained in the 2004 (fn 3 herein) and 2005 Stock Option Agreements precludes Hartley from using any "trade secrets, customer lists, or information regarding customers . . . ." Although Hartley argues that the announcement letter was sent to individuals whose names and addresses were obtained from other lists including charity rosters and external memberships, the fact remains that these individuals were customers of Compass whose names were part of Compass' customer list. The determinative factor for what constitutes a customer list is not whether the list can be recreated from information obtained elsewhere, but whether the client information was obtained while Hartley was employed by Compass. *See Merrill Lynch, et al. v. McClafferty,* 287 F.Supp.2d at 1248. As a result, Hartley is bound by the terms of

12. Hartley could have generally informed his customers of his resignation, such as through a newspaper or trade paper advertisement containing a non-specific impersonal announcement to former clients. *See Schultz,* 2001 WL 1681973 at *3. The critical issue in *Alpha Tax* was whether the mailings were "personal solicitations." 761 P.2d at 1075. The Arizona Court of Appeals found that be-

cause the announcements of new employment were "addressed personally to customers" and contained a discount they constituted personal solicitations. The Court held that the general mailings were not personal mailings even though they contained the same discount coupons as the other announcements.

the agreement precluding him from utilizing customer information, including the customer list.

### c. Non-compete

The non-compete provision contained in the 2005 Stock Option Agreement (fn 6 herein) precludes Hartley from doing business with any customer of Compass in any capacity. This is the case even if the customer opts to transfer his account from Compass to Erisey. Hartley acknowledged that he accepted business from former Compass clients, thus, his primary defense with regard to this covenant rests upon the enforceability of the covenant. Because the covenant is otherwise valid, the Court will uphold this provision.

### d. Other Counts

Plaintiff alleges additional counts including breach of loyalty provisions, implied covenant of good faith and fair dealing, violations of the Trade Secrets Act, A.R.S. § 44–401, Conversion, Tortious Interference with Contract, and Unjust Enrichment. *See* Complaint. The Court need not address the validity of each and every claim. Rather, for purposes of determining Plaintiff's likelihood of success on the merits, it is sufficient that the Court finds that Plaintiff is likely to succeed on the breach of contract claims.

### B. Irreparable Injury

Under Arizona law, "once a protectable interest is established, irreparable injury is presumed to follow if the interest is not protected." *Phoenix Orthopaedic Surgeons, Ltd. v. Peairs*, 164 Ariz. 54, 790 P.2d 752, 757 (App.1989). In addition, because the covenants have only a limited duration, injunctive relief is the only means of effective enforcement. Hartley and Erisey have accepted eleven customers with assets of approximately $18 million and will continue to accept their business unless enjoined from doing so. With respect to Defendant's use of confidential information, including customer information, the only means of effective enforcement of this provision is injunctive relief.

### C. Balance of Harm

Compass relies on the relationships between its employees and customers in order to successfully and profitably operate its business. These relationships depend upon protecting confidential customer information. Enforcement of covenants like these are critical to protecting these interests.

At the same time, although enforcement of the covenant would impose a burden on Defendants, it is limited to one year and a 25 mile radius. Such a burden is reasonable in light of the specific limited area within the Phoenix metropolitan area, Hartley's position, the confidential information he received and valuable compensation provided by Compass. In this regard, the balance of hardships tips in Compass' favor.

### D. Public Interest

Courts have held that the public interest is served by protecting a company's right to proprietary information, business operations, and contractual rights. *See McClafferty*, 287 F.Supp.2d at 1249. In addition, enforcing these covenants is consistent with the public policy of protecting a company's interest in its customer base from unfair competition and the protection of trade secrets and confidential information. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

At the same time, there is concern over enforcing a covenant to prevent an individual from accepting the business of a cus-

tomer, who has the right to choose who will service the customer's financial needs. This is problematic because it is difficult, if not impossible, to determine whether such customers would have intended to transfer their accounts but for the solicitation. This issue was raised in *McClafferty*, but not addressed, because the court only dealt with a non-solicitation covenant rather than a non-compete covenant. 287 F.Supp.2d at 1250. The Court has some concern for the rights of the customers to choose their financial advisors, but it does not find that the concern warrants not enjoining Hartley's conduct.

There is also the more obvious issue of restricting a departing employee's right to go into business for himself. Indeed, a strong public policy argument has been made against enforcing these agreements in certain professions. *See Farber*, 194 Ariz. 363, 982 P.2d 1277, 1282 (1999). However, there is no Arizona case extending the public policy issue raised in *Farber* to portfolio managers.

## IV. CONCLUSION

Weighing all of the aforementioned factors, the Court finds that a preliminary injunction is warranted. The parties shall submit a joint statement of proposed injunctive relief within seven days of this Order, and the Court will issue an order consistent with this Opinion.

Accordingly,

IT IS ORDERED that Plaintiff's Motion For Preliminary Injunction is GRANTED in accordance with the provisions of this Order.

IT IS FURTHER ORDERED that the parties shall submit a joint statement of proposed injunctive relief within seven days of this Order.